Good afternoon. Illinois Appellate Court First District Court is now in session. The Sixth Division, the Honorable Justice Sharon O. Johnson presiding. Case number 22-0494, Peeble v. Antrell Johnson. Good afternoon. I'm Justice Sharon Oden Johnson, and I'm joined by my colleagues, Justice Michael B. Hyman and Justice Sanjay T. Taylor. You will each be given 20 minutes in which to present your argument with the appellant being given the opportunity to reserve time for rebuttal. So I'd like for counsel for the appellant to please state your appearance for the record. Good afternoon, Your Honors. My name is Christina Solomon from the Office of the State Appellate Defender for Mr. Antrell Johnson. Okay. And would you like to reserve any time for rebuttal? Yes, please. I'd like to reserve five minutes. Okay. And counsel for the appellee, please state your appearance for the record. Good afternoon, Your Honors. Assistant State's Attorney Caitlin Chenew on behalf of the people. Very good. You may begin, Attorney Solomon. Thank you. May it please the court and counsel. The state's case against Mr. Johnson is singularly based upon eyewitness identification testimony that was incredible and unreliable. One of the state's witnesses recanted his prior identification while testifying at trial. The second admitted that his identification was based on hearsay. And the third identification is unreliable when analyzed under the biggest factors. Also considering the unimpeached testimony of Mr. Johnson's alibi witness, the state's evidence was insufficient. In light of the weaknesses in the state's case, defense counsel was also ineffective for failing to call an additional alibi witness that only would have strengthened Mr. Johnson's alibi defense. There was no physical evidence tying Mr. Johnson to the shooting. The recovered gun was not tied to Mr. Johnson in any way. There was no DNA evidence, no gunshot residue. And Mr. Johnson never made any inculpatory statements or confessed to the shooting. As such, the state's case relied exclusively upon eyewitness testimony. Two of the witnesses' identifications were incredible based on their trial testimony, and on top of their incredibility, were unreliable when considered under the biggest factors. First, we have D'Angelo Mixon. Mixon, along with Tory and Tyler, were the two young men who were shot that day. Mixon testified at trial that he was walking towards Tristan Thomas' house. He saw Thomas' shocked face, turned, saw a gun, heard about seven shots, and then blinked out. His words were, blinked out. The shooter was about one foot away, and he testified that he did not see the person. He did see the gun. Of course, he identified the shooter very shortly thereafter to Thomas, right? He did, Your Honor. Thomas' testimony is that Mixon, right after the shooting, told him that it was Trell, as in Mr. Johnson, my client. What should we do with that? That was something he had said, and then you have to look at his testimony at the hospital, too. Not testimony, but his statements at the hospital. Yes, Your Honor. Mixon did identify Mr. Johnson right after the shooting and at the hospital, but that is not necessarily determinative. The biggest factors show that Mr. Mixon's identification was still unreliable. One of the primary factors that we need to look at is the opportunity to view the witness. Mixon stated that when he turned around, all he saw was a gun, and he heard shots going off, and then he blinked out. Even if he had the opportunity to see a person or was focused on the person... That's what he testified to at trial, correct? Yes, that is what he testified at trial. But the statement that he gave at the hospital, he never qualified that statement at the time, did he? Not based on what we know of the statement that later came in at trial, yes. And the reason those statements came in at trial were because Mixon was qualifying them at trial later on. Mixon, or D'Angelo Mixon, I guess, his sister was dating the defendant's brother, and they had a child together, right? Yes, Your Honor. So there might be some motive to flip your testimony. Your Honor, Mixon testified explicitly, but that was not the reason that he was giving the testimony that he was giving that day. Did you have a prerogative to make that determination, though? Are we second-guessing a jury? No, Your Honor, we're not second-guessing a jury. The standard of review here is deferential, but it's not binding. And it doesn't prevent this court from casting a critical eye to the evidence. In identification cases, we know that a witness can be sincere and confident, but nonetheless wrong. And a jury can determine that a witness appears credible or is testifying in good faith. But the law and science have shown us that eyewitness testimony can be unreliable regardless. But isn't that more so where the witness does not have personal prior knowledge of the alleged offender? In this case, Mixon knew him. So, you know, it's less likely that he would misidentify someone that he knew, even though, you know, he may have only seen him for a couple seconds or, you know, been distracted by the gun. Your Honor, I think that might be a factor. I will say to begin that Mixon's testimony, as I argued earlier, is not credible. His identification was completely recanted at trial, okay? So the point is that Mixon's not credible as a witness. Beyond that, he was also unreliable. So the fact that he knows Mr. Johnson is potentially a factor to determine whether or not he's a reliable, whether or not this was a reliable ID. But I don't, this is not, because Mixon recanted his identification at trial, we have to assess that as a factor on whether Mixon was a credible witness or not. And I would argue that he was not, based on not only the fact that he completely recanted the identification at trial. I would say there are plenty of other factors to indicate that he wasn't credible. Let's talk about one of those factors. At the hospital, first, he testified that he was under drugs or under alcohol. He had been taking substances and drinking alcohol at that time in his life, okay? And that he had been drinking that day, as I understand this, with the testimony. Do we know how much liquor he drank or his condition with regard to the intake of alcohol or drugs on the day and the morning of the, after the shooting? That specific evidence wasn't presented at trial, Your Honor. But Mixon did testify that he had been drinking that day. And he had plans, or at that time in his life, yes, like you said, that he was smoking. And Thomas testified as well that they had plans to be recreationally smoking that day. What about the fact that he was interviewed within hours after he was taken to the hospital? And then he was interviewed again, I think it was 4 o'clock in the morning. But in either case, do we know what kind of drugs he was on at that time? Having been shot, I would assume that he would be under some kind of painkillers. And those painkillers would have been taking an effect at that time. And being under the influence of anything can have an effect, in cases say, on what somebody may remember. Yes, Your Honor. We can assume that that evidence wasn't presented at trial, whether or not Mixon was given particular drugs for his gunshot wounds. But the evidence did come out that he was being treated. He was treated in the ambulance on the way to the hospital. And when he got to Christ Hospital, were handed up. Was it the defense theory that Mixon was incapacitated at the time of his statement? Certainly, the circumstances of the identification are suspect, partially because of his drinking and because of the bare minimum ability he had to observe whoever it was behind him. Not to mention his recantation at trial. Was there an argument that the defense counsel argued to the jury that the statement given to the police when he's admitted to the hospital and then the next morning that that statement is unreliable because he had been drinking or he had been on drugs? Was that argument made to the jury? Defense counsel argued it. I wouldn't say that he used the word incapacitated. I don't recall specifically what language he used. But the argument was made at trial when he asked Mixon on cross-examination whether Mixon had been drinking that day. I think it turned to Janice Washington. She's the one witness who did not change her testimony.  I think your argument is that sometimes identification testimony is suspect. And why is this testimony suspect? As I understand it, she is waiting in the backseat of a car parked in the grassy area next to the church. I think they're waiting to go into choir practice, waiting for the pastor to come out. And from looking at the exhibit, it appears that the shooting occurred two to three car lengths from where they were parked. Why is her testimony to be discounted by us? Well, Your Honor, going through the bigger factors again, the same very limited opportunity to view the shooter applies to Washington's view of what happened as well. Not only that, but she was farther away. She was sitting in the seat in the car that was farthest away from the street and farthest away from the shooting. She testified that she saw it through the side window and the windshield, which means there were potential obstructions based on the driver's seat and things like that. She leaned back when the shooting began. The entire incident was only a few seconds. She testified less than a minute. And Washington did testify also that the shooter's face was obstructed by a hat. That was part of her testimony. We also look at her degree of attention. This court has found in previous cases that the presence of a gun severely limits a person's ability to recall details. And Washington testified that she was afraid and she wanted to avoid drawing attention to herself or being seen by the shooter. She indicated in her testimony that the person that she had identified had the same mouth and nose as the person she saw. Yes, Your Honor. She testified later on that the reason that she picked the person out was because of his nose and lips. However, I would like to point out that when she was talking to the police at the scene, she never mentioned those specific details. And so that goes to another bigger factor, a prior description. Her and her husband. How about the color of the skin? Yes, Your Honor. The Washington testified that she could tell he was a lighter-skinned African-American. However, that applies to hundreds, if not thousands, of people in this city, of young black men in this city. To describe that one similarity as an accurate description of the prior shooter would be unfair. It's not specific enough. And again, like I said, she didn't testify. I'm sorry. She didn't tell the police officer that she noticed in particular the shooter's nose and mouth. She only said that later on once she made the identification. I'd like to go back to something I just said. I think you misspoke. My understanding is that Washington said that he had caramel skin or medium complexion. And Thomas said light complexion. Yes, Your Honor. I think you're correct. The words that Washington used were medium brown complexion. Okay. And this is black on black. And the fact is that there is a lot of research in case law about how people who are familiar with their own race, more than cross-racial identifications. So what do we make of the fact that here is somebody who sees Washington, sees someone for seconds, if that, and says it's medium. And somebody who knows Johnson said light skin. Those are not the same. So is there anything to be made of that? Well, Your Honor, it's one of the many inconsistencies that we can count in this case with these witnesses. We have that complexion, like you pointed out. We have the fact that everyone testifies, except Mixon, who doesn't testify at all about the shooter's appearance, that something was obscuring the shooter's face. Thomas says, I'm running out of time here. I believe I have just under a minute. Is it okay if I finish the question? I'll let you know when you're done. Okay. Thank you. Thank you, Your Honor. Thomas testifies that it was a hat initially. He at times calls it a mask over the shooter's face, obscuring the face, or a hood that was pulled tightly. Washington testified that it was a hat covering the face. Robert Laster, Washington's husband, testified that it was a hat. But throughout all of it, there is that discrepancy. Another huge discrepancy among the testimony, Mixon testifies that the shooter was one foot behind him. Thomas testifies that the shooter was seven to eight feet behind him. And Laster, Washington's husband, testifies that the shooter was 20 feet away. The difference between 20 feet and one foot is astronomical when it comes to then saying that these witnesses are able to see such specific detail about a shooter's obscure face that they were able to identify him in a photo array in Mixon, in Thomas's case, that day or one day later, and in Washington's case, a week later. And it should be noted that Laster, who was closer to the shooting and had a less obscured view through a window in the backseat, was not able to make an identification. In fact, when he viewed the live lineup, he identified someone besides Mr. Johnson. I'd like to ask you one more question with respect to the identification. And then after you give your answer, if you could spend a little time on your alternative argument regarding the ineffective assistance. So with respect to or how do you reconcile Washington's positive identification in the photo array of your client when there were other individuals, other photos that she also viewed if her identification was so unreliable or she was unable to have a clear view? How do you reconcile that she actually identified your client? If I understand your question, Your Honor, are you asking me? If there are 10 photos in front of the witness and your position is that she didn't have a good view of the person, she didn't see their face, how do you reconcile that out of those 10 photos, she still picked your client? Well, Your Honor, Washington's identification occurred after Mixon and Thomas's, one week after the shooting, and the identification itself was unrecorded. There are documented cases with multiple witnesses identifying the same person, but it later comes to light that that was the wrong identification. Those cases exist, and I think that something similar can happen here. I don't think that 1 in 10 is such an absurd reality. And what seems more impractical is thinking that Washington, from the distance that she was at, with the obscurities that we know were there for the shooter, obscuring the shooter's face, the distance from the car to the scene of the crime, those things, it would be impractical to imagine that Washington was able to get such a clear view of the shooter that she would make a correct identification. I have two follow-up questions. One, were there 10 photos? Do we know that? Is that in the record? No, I just gave that by way of example. Because usually they don't have that many. But does the record have anything to say with how many photos she looked at? The photo array is in the record, Your Honor. If I recall correctly, which I might not, I think that there were six photos. That was my recollection, was six. Okay. The second question is, how do you reconcile the fact that Laster and Washington together, we don't know who said what, because they were interviewed together and the police took it down as together, but they said that the shooter had black hair and a faded type of haircut. And he was wearing a hat. They say he was wearing a hat. How could they say both? Well, Your Honor, I can't explain what Laster and Washington were describing at the time. I think, again, it points to the incredibility of their identification. Was it the incredibility or that they didn't really get a good view of, you know, their memories. There's something about what they saw, even, you know, after they were, when they were interviewed. There's something, I mean, if you have both, it just doesn't make any sense. Yes. Yeah, I agree, Your Honor. It doesn't make sense. And it's, it's one of the facts to consider regarding their unreliability, the unreliability of their identification. Yes. Okay, so counsel, I'd like to give you a moment or two to discuss your alternative argument. Yes. So, as you've discussed, the state's evidence against Mr. Johnson was weak because of the unreliability of the identification witnesses. This is particularly true in light of Kennedy Miles' testimony that she was with Mr. Johnson on the night of the shooting. Miles' testimony was unimpeached. However, it was lacking in detail and Vernon Johnson, Mr. Johnson's cousin, could have provided critical details to Miles' testimony that was necessary to fully support Mr. Johnson's alibi defense. In failing to call Vernon, defense counsel was ineffective. So, Miles testified as to Mr. Johnson's whereabouts on the night in question. She stated that she and Mr. Johnson went to his grandmother's house sometime in the afternoon, but didn't give a specific time. She testified that he could, she could not remember the time that she and Mr. Johnson left the grandmother's house, but estimated that it was around 6 or 7 p.m. And then eventually told the defense investigator prior to trial that it was around 7 or 7.30 p.m. And then at the post-trial hearing, Vernon testified that Mr. Johnson arrived around 6 p.m., stayed for about three or four hours, and then left. Both Miles and Vernon testified that Vernon's girlfriend, their child, Mr. Johnson's daughter, and Mr. Johnson's daughter were all there that night. They both discussed hearing gunshots and Mr. Johnson's reaction while running into the house with his daughter. They specifically described Mr. Johnson grabbing his daughter by the collar of her shirt and running inside. Another fact to consider is that Vernon testified, excuse me, that Vernon was on electronic monitoring. His location would not be in dispute. That information, along with the other corroborative details to Miles' account with the addition of a specific time, would reasonably have affected the outcome of trial, particularly considering... Why shouldn't we find that this was just trial strategy? Well, Your Honor, the fact that counsel chose to present an alibi defense is an aspect of trial strategy. However, failing to fully provide that defense, to fully support that defense, is ineffective. You can strategize on what defense to pick. However, making decisions that harm your client if you pick that defense, such as not corroborating the alibi witness, especially in a case where a second alibi witness could not have hurt Mr. Johnson, cannot be considered strategy. Okay, thank you very much. You still have five minutes rebuttal. I'd like for Attorney Shanus to... Shanu.  Shanu. Shanu, I'm sorry. No worries. Okay, you may proceed, counsel. Thank you, Your Honor, and Your Honors. May it please the court. The evidence at trial in this case established that on April 24th, 2017, the defendant ran up behind Torean Tyler and D'Angelo Mixon. He fired two bullets into D'Angelo Mixon's body. We know what the facts are, and the question is whether it was a defendant. So, this is an eyewitness case, isn't it? Yes, Your Honor. Okay. And there's four eyewitnesses. Yes, Your Honor. Which of those four, as you said in your brief, the Supreme Court has said one eyewitness is enough, depending on the circumstances, permitting the positive identification. Correct? Yes. The circumstances. So, is there any particular witness that you think was better than the others? I would argue that the strongest witness, just because she is completely, you know, she doesn't, she's never, she doesn't, she has nothing to do with anyone else in this case. She just happened to be there. It would be Janice Washington. She was unconnected to anyone in the case. She testified consistently directly after the shooting. She identified the defendant in a photo array, and she testified at trial. She never wavered from her identification. And she did, you know, her testimony in terms of what the defendant was wearing, and the lighting outside was corroborated by her husband. What he was wearing doesn't, that doesn't mean anything, does it? I mean, that doesn't identify the person. No, Your Honor. But I think that having that corroboration in terms of having Robert and Tristan and Angelo and Janice all say, you know, these are the things that he was wearing, and then three of those four witnesses. But there was nobody that said that that was him wearing the clothes. I mean, those are the clothes. But that doesn't tell you who was wearing the clothes. Yes, Your Honor. This is an identification case. It's not a clothes identification. If it was a clothes identification, I think we could agree. They all identified the clothes, the colors. And we could even see that on the grainy video. So it's not a question of what he was wearing, is it? I would just say it does go, when you have the consistent testimony, it goes to the fact that, you know, she was reliable in terms of everyone saw the same person. And three out of four eyewitnesses testified that it was the defendant. Well, but you just said, let's go to Washington's testimony. Okay. What about the fact that she said that he had a hat, and then she describes his hairline? Yes. If she says he's wearing a baseball cap, you can see someone's hair. You can see half of their head underneath a baseball cap on the side of the baseball cap. Did she say that? She didn't describe what part of the hair she saw. She described the hairstyle. How would you see a hairstyle with a cap on? A baseball cap doesn't cover your entire head. It covers the top. No. I mean, I wear one, and you can still see my hair. But you don't know. Sometimes baseball caps go all the way, you know, the back is not open. We don't know whether the back was open or not, do we? We don't.  Her husband. We know the husband couldn't pick out Johnson, right? Correct. He testified that he could not, and because his reasoning was that he was attempting to ensure that everyone else in the car, all three of them, plus him, were safe, and he was frantically, you know, trying to pay attention to that. And then Janice was the one who was able to identify the shooter, because she had their eyes on him. How many seconds did she have to look at him? She had a few seconds to look at him. And she looked at his back? And how many people in Chicago would have a large nose and big lips? She did not specifically testify as to what they, like she said. That is a very, what my point is, isn't that a general characterization of somebody? I mean, there are many people that would identify. Sure, Your Honor. If you pick up a picture because of somebody's lips and nose, maybe, we don't know what, you know, that doesn't mean that that's the person. Well, we're not looking. Your second. Your Honor, we're not looking. Sorry. Weren't the other people in the lineup of similar description? Yes, Your Honor. They were all around the same age and looked and had similar features. Yes. And she chose the defendant. She again, you know, she consistently kept identifying him. And then at trial, she identified him again. And we're also not looking at any one witness's testimony in a vacuum here. I do want to reiterate the standard of review with this specific issue is the highest one we have. We are giving deference to the jury, as my opposing counsel pointed out, is a highly deferential standard. And in this case, counsel is asking to this court to disregard the credibility determinations of not one, but three different eyewitnesses. And here, Janice Washington testified that she recognized the defendant. She identified the defendant. We have case law that we cited in our brief stating that in their cases where this court has upheld identifications based on only the recognizing the nose of the person. And that was sufficient to uphold this conviction. This case is much different than the cases you cite with regard to Washington. She had mere seconds to see him. In the cases that are cited, people who were with a person five or ten minutes had an opportunity to interact with an individual. That, again, you have to look at the circumstances permitting a positive identification. So what testimony did she give regarding the circumstances permitting a positive identification? She testified that it was very bright outside when she saw the defendant. She testified that there was nothing blocking her view of the defendant when she saw him run up and begin shooting. She explained that after the shooting began, she scooted down and back in the car so that she would avoid potentially being seen. She saw two boys walking down the street. She saw another one run up behind them, pull out a gun, and shoot those boys. She and her husband then described the defendant to the officer at the scene of the shooting. And then she positively identified him in a photo lineup a week later and then at trial again. Again. Do we know, Council, how far Ms. Washington and Mr. Lester are in their parked car to where the shooting occurred? My sense from the exhibit is maybe a couple car lengths away. Is that fair? Two or three, right. Yes. Yes, they were in a parking lot waiting for a rehearsal to begin at a church nearby. And so they were sitting in the car and observed the shooting from there. How do you explain that she said the individual had caramel or medium colored skin and Mixon said Johnson's light skinned? Your Honor, I would argue that people have different ways of describing the same person. I just I don't I'm not sure why they chose those specific words, but I don't think that that is determinative of anything. And I don't think it means that they saw different people. They clearly both saw the shooter. And the shooter's skin. I don't think it's so sure. Mixon said he didn't know who the shooter was. At trial, he testified. No, he doesn't know. At trial. Why are you saying that his that testimony should be believed? Should be believed or should not be believed. I'm saying D'Angelo Mixon should be believed. He was very consistent with his testimony, identifying the defendant directly after the shooting at the hospital. He testified under the influence of alcohol. We don't have information from the record of how much alcohol he didn't say that he had been drunk. He didn't say he was on drugs. Was he asked whether he was drunk or whether he was on drugs? I believe so, Your Honor, but I don't recall exactly from the record. I believe he was, though. But he did testify on camera for A.S.A. Hodel that it was Johnson. He identified the defendant and then hours later he identified the same defendant again for the detective who came and showed him another photo array. But then at trial, he said that was he was wrong. It was not him. And again, it was he was shot in the back from the back. Yes, he said he turned around before he was shot and saw the gun pointed out to Ray and Tyler first. And at trial, you're right on cross-examination after repeated questioning, he was guilted into saying, I really don't know. When you say guilted, was there one objection made by the prosecutor? There was an objection made when the defense asked D'Angelo if he felt bad for identifying someone that he didn't know for sure shot him. We objected. That's not a gilded. Well, you just said he was gilded into it. He was harassed at trial. He was harassed. Tell me, tell me about the objection that he was being harassed. Was there? Yes, there was. There was. It was form of the question we objected. It's in the record. I know that counsel defense counsel's brief say we didn't, but we did. I double checked. We objected. And the objection was that he was being harassed. It was form of the question. It was form of the question because that harassment. When you equate when somebody says a form of the question to harassment, is that is that what you're doing? Or is it where the words harassment used? The word form of the question, the term form of the question. So, I mean, I don't want to exaggerate here, but when somebody says form of the question, are we always to assume that means harassment? No, Your Honor. I think the question. How did you jump from form of the question to harassment? Because I looked at the record and the question that was objected to is saying, do you feel bad for identifying someone you didn't know for sure shot you? And from that, that's your interpretation of why you're going into the mind of the person who who objected. Did that say harassment to form of the question? OK, it was it was form of the question. We felt it was inappropriate to ask that type of question. And on redirect, he he then said he identified the defendant because he looked and saw him and recognized him. And as you heard during defense counsel's argument, he did know the defendant prior to this incident. How do you reconcile his statement that the defendant was, you know, only a couple of feet away as opposed to further? Your Honor, I do think that so defendant ran up behind him and Torian, so I'm sure he turned and looked around as defendant is running. And while, you know, one witness sees from a few car lengths away, the defendant is further away. If I had someone running behind me with a gun, I would maybe think they were closer than they actually were. I guess specifically with respect to the medical examiner indicating that it was not a close range shooting. Right. The medical examiner did indicate that she didn't tell us. What close range is versus not like what exactly the amount of feet would be. But I do think that D'Angelo was obviously in a state of stress and observing. You know, he turned and he maybe couldn't accurately gauge the feet between him and the defendant. That, again, the people aren't saying that there are zero inconsistencies in these witnesses. We are saying that we have a standard of review on appeal. It is a very deferential. We have three eyewitnesses who identified the defendant. We have four eyewitnesses total who saw the shooting. And with taking into like looking at all of the witnesses and their testimony, the evidence was more than sufficient for the jury to find the defendant guilty of murdering Torian Tyler. Your honors, I would like to briefly touch on Kennedy Miles. If you have no further questions. You may proceed. Thank you, Your Honor. So Kennedy, counsel does argue that Kennedy Miles was unimpeached at trial. She was an alibi witness. She did testify as to, you know, the general day of the shooting that she met defendant at his grandmother's house, stayed for a few hours. Vernon Johnson was there. They heard shots and then she left and they walked back to her house. She was very unsure of timing. She was asked a few times whether she remembered saying earlier, you know, to investigators that it was this time that she arrived this time when they left. When they arrived at her house, she wasn't sure. Her general testimony was that she arrived sometime in the afternoon at defendant's grandmother's house with Vernon Johnson and their children, that they stayed for a few hours, that the shots went off 30 or 40 minutes after she arrived. So in the afternoon, not 7 p.m. when the shooting happened and that she and defendant then left and went back to her house. They walked for an hour and got there as the sun was setting around 7, that he left about three hours later. So around 8 or 9 p.m. or 10 p.m. from her house. And as this court heard from my opposing counsel, Vernon Johnson's testimony is quite different. It contradicts her. And, you know, going into this. Was her testimony as the defense's uncontradicted? It was it wasn't contradicted at trial because she was the only one. So in terms of alibi, it wasn't it wasn't it wasn't contradicted by Vernon Johnson since he didn't testify. I'm talking about general doesn't testify at trial, but it was uncontradicted testimony at trial. No, obviously it wasn't because she testified that she was with defendant during the shooting, which was contradicted by all of the eyewitnesses. But in terms of her and Johnson, I would disagree with you. You're saying that she wasn't with the defendant at the time of the shooting. She says she was with the defendant, but not at the shooting. It wasn't he didn't shoot. I mean, it's an alibi witness. So, well, she's she testified that the shooting occurred 30 or 40 minutes after she arrived at his grandmother's house, which is an afternoon. So three or four p.m. Not at the time of the shooting. So there could have been another shooting prior to this one. But it wasn't that her testimony didn't match this timeline. I would like to move to the ineffective assistance of counsel claim. You minutes. So the defendant raised this claim in a post here in a post trial motion. It was litigated before the trial court and the trial court rejected the claim. And there are two main reasons that had Vernon Johnson been called to testify. He would not it would not have changed the outcome of trial with his testimony in addition to Kennedy miles. The first reason is that, again, Vernon Johnson's testimony directly contradicted that of Kennedy miles in his version of events. Miles was not present at the defendant's grandmother's house. He testified it was him, his his son, defendant and defendant's daughter, and then his girlfriend, Johnson's girlfriend, Brianna. He also testified the defendant arrived around six, left three or four hours later. And the shots went off, you know, between six and defendant leaving when they were there. And and that, you know, directly contradicts Kennedy miles's timeline, which placed her in defendant at the house in the early afternoon and walking back to her home. By around seven. The second reason that his testimony was not credible and would not have changed the outcome of trial was that. Excuse me. He was related to the defendant. He was a biased witness. He testified that he and defendant were very close. They hung out together outside of family events even. And, you know, this court and other courts have pointed out many times that a trial court and a jury is not obligated to believe a defendant's alibi witness over that of the state, especially where the alibi witness is related to the defendant. So overall, the trial counsel at this trial had two options. He had two alibi witnesses. They contradicted each other. He chose that Kennedy miles over Vernon Johnson, likely because Vernon Johnson is related to the defendant. And trial counsel was not ineffective for not presenting Vernon Johnson's testimony. And for this, these reasons and those state in our brief, we ask that this court reject defendants claims and affirm conviction for first degree murder. Thank you. But had counsel presented both alibi witnesses, the jury have decided to believe, you know, one. Yes, Your Honor, perhaps. But the standard here isn't like whether he could have. It's whether counsel was ineffective for not presenting it. And in this case, counsel was not. Okay. Any other questions? Thank you very much. Thank you. Rebuttal. Thank you, Your Honor. A couple of points I would just like to quickly make. Pointing to counsel's comment about the legal standard, the legal standard. We cannot disregard common sense and analytical reasoning for the concept of legal concept of deference. Absolutely. Deference should be given to the fact finder at trial. However, as I discussed earlier, the reasoning, critical thinking skills can still be used on appeal to apply the law. Also, regarding the fact that Mixon was guilted into recantation at trial. In fact, Mixon recanted in his during direct when the state was questioning him. He said that he did not see the person who was holding the gun that happened during direct examination, not during cross examination, during a supposedly aggressive cross examination by defense counsel. And what I said in my what we said in our brief was not that the state never objected to defense counsel's arguments. It was just that counsel did not object to the manner of defense counsel's questions. And and. I think I'll move on to the second question to the second point. Excuse me, the second argument. The state is saying that we should forgive the inconsistencies for their own witnesses between Mixon and Thomas and Washington regarding their case. But that the inconsistencies between Vernon and Miles mean that counsel was not ineffective for supporting his alibi for supporting Mr. Johnson's alibi defense with Vernon. Whatever the small inconsistencies between Vernon and Miles testimony, which would be the timing. Could be explained by the fact that this happened four years prior to trial four years prior to the time that Miles and Vernon were testifying. In regards to the fact that Vernon was related to Mr. Johnson when it comes to alibi defenses. Those are the people that you spend the most time with. These are things that defense counsel. Could have discussed and likely knows about these regular defenses at trial. And the point is not whether the jury would have been absolutely convinced by this is whether there is a reasonable probability that the outcome of trial would have been different. And the fact that Vernon would have provided corroborative testimony regarding the specific details of what happened that night corroborated what Miles said is what I'm trying to say. That would have there's at least a reasonable probability that the jury would have believed them, particularly because the jury spent five hours deliberating and asked for Miles testimony. These are indicators that they took Miles testimony very seriously. And so unless your honors have any other questions, I would conclude. Any questions from the panel? Okay, thank you very much. That concludes the oral arguments and people versus Johnson. I certainly appreciate your arguments on today. You've certainly given us quite a bit to consider. You've done an excellent job in presenting your clients positioning, and I thank you for that. And we will take it under consideration and issue a an opinion as soon as practical. Be well. Thank you. Thank you, Your Honor.